# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### MEDFORD DIVISION

PAUL R. ANDRE, an individual

Plaintiff,

v.

BANK OF AMERICA, N.A.; COUNTRYWIDE
HOME LOANS, INC., a New York Corporation;
and BAC HOME LOANS SERVICING, LP,

Defendants.

Civ. No. 11-3077-CL

REPORT & RECOMMENDATION

CLARKE, Magistrate Judge.

The dispute in this case concerns the foreclosure and sale of real property located at 121
NW Fall Run Drive in Grants Pass, Oregon ("the Fall Run property"). On June 9, 2011, plaintiff
Paul R. Andre ("Andre") filed this action in the Circuit Court for the State of Oregon for
Josephine County, alleging claims for negligent misrepresentation, breach of contract, and
intentional infliction of emotional distress against defendants Countrywide Home Loans, Inc.
("Countrywide") and Bank of America, N.A., for itself and as successor by merger to BAC
Home Loans Servicing, LP ("BANA") (collectively, "defendants"), case number 11CV0565.
Defendants timely removed the action to this court on July 15, 2009, based on diversity
jurisdiction. 28 U.S.C. §§ 1332, 1441. The matter is now before the court on defendants'

Page 1 – REPORT AND RECOMMENDATION

motion (#6) to dismiss. For the reasons stated below, defendants' motion should be GRANTED

and plaintiff's request for leave to file an amended complaint should be GRANTED.

## BACKGROUND

On or about April 24, 2007, Andre used the Fall Run property to secure a $267,000

mortgage loan from Countrywide. (Compl., ¶ 3).[1] The deed of trust securing the mortgage was

recorded April 30, 2007, in the official records of Josephine County as document number 2007-

008468. (Decl. of Francie Cushman in Supp. of Req. for Judicial Notice ("Cushman Decl."), Ex.

A). The deed of trust identifies Countrywide as the "Lender," Ticor Title Company of Oregon as

the "Trustee," and MERS as the beneficiary "acting solely as a nominee for Lender and Lender's

successors and assigns." (Id.). The deed of trust provides that in the event the Borrower should

fail to cure a properly noticed default, the Lender would be entitled to require payment in full of

all sums secured by the deed of trust and invoke its power of sale, and further provides:

> "Extension of the time for payment or modification of amortization of the sums
> secured by this Security Instrument granted by Lender to Borrower or any
> Successor in Interest of Borrower shall not operate to release the liability of
> Borrower or any Successors in Interest of Borrower. . . . Any forbearance by
> Lender in exercising any right or remedy including, without limitation, Lender's
> acceptance of payments from third persons, entities or Successors in Interest of
> Borrower or in amounts less than the amount then due, shall not be a waiver of or
> preclude the exercise of any right or remedy."

(Cushman Decl., Ex. A., ¶¶ 12, 22).

Sometime in 2008, Andre contacted Countrywide because he anticipated difficulty

making his monthly mortgage payments. (Compl., ¶ 4). Countrywide advised him he would

have to miss payments in order to be considered for a loan modification. (Id., ¶ 5). Beginning in

August 2008, Andre did not make his monthly mortgage payments. (Id., ¶ 6; Cushman Decl.,

Ex. C). After missing an unspecified number of monthly payments, Andre contacted

[1] Plaintiff's state court Complaint is attached to Defendant's Supplement to Notice of Removal,
Dckt. # 5.

Countrywide and applied for a loan modification; Countrywide advised it would send him paperwork which he would need to complete and return. (Id., ¶¶ 6-7). On December 22, 2008, an Appointment of Successor Trustee was recorded as document number 2008-019242, appointing ReconTrust Company, N.A. ("ReconTrust") as successor trustee under the deed of trust, and a Notice of Default and Election to Sell was recorded as document number 2008-019243, setting the foreclosure sale of the Fall Run property for April 24, 2009. (Cushman Decl., Exs. B & C).

Sometime between December 2008 and January 2009, Andre advised Countrywide he had not received the modification paperwork and was told he must wait for it to arrive. (Compl., ¶ 8). In mid- to late-January 2009, BANA told Andre his mortgage loan was in modification status, that the paperwork to bring his loan current should arrive in approximately four weeks, and that BANA could no longer accept payments on his mortgage loan due to the pending foreclosure. (Id., ¶ 10).

Andre followed up with BANA at least three times, on March 22, March 29, and April 29, to find out the status of his modification application paperwork. (Id., ¶¶ 11-13). While BANA was never able to tell him where his paperwork was or when he would receive it, he was repeatedly told that his mortgage loan was in "workout status," that the foreclosure sale date would be postponed while his modification application was pending, and that he should continue calling back for updates. (Id., ¶¶ 11-13). On May 4, 2009, BANA told Andre that FedEx had returned his modification paperwork package, that he would need to reapply for modification, and that expedited processing was not available. (Id., ¶ 14). BANA then conferenced Countrywide into the call, and Countrywide advised it had generated a new modification and loan referral for Andre's loan. (Id.).

Andre continued to follow up with Countrywide and BANA throughout May and June of 2009. In late May 2009, BANA told Andre his loan was in modification status and would be processed on a "fast track." (Id., ¶ 15). However, on June 1, 2009, BANA told Andre the foreclosure sale was scheduled for that day and could not be postponed, and that he would need to reapply for a modification. (Id., ¶ 16). However, Andre called the Trustee Sale Information Line and was told the foreclosure sale date had been moved to July 1, 2009. (Id., ¶ 17).

On June 4 or 5, 2009, Countrywide told Andre it had closed out his modification application because he had not returned the modification paperwork to BANA and he would need to start the process over with BANA, but then told him he had been conditionally approved for a loan modification contingent only upon his receipt of the documentation, which Countrywide would send to him. (Id., ¶ 18). On June 11 and again on June 19, Countrywide advised Andre his modification application was still under review and there would be no foreclosure sale while his loan modification application was pending. (Id., ¶¶ 19, 22). Countrywide told Andre a third party would not be able to speed up the modification application process and discouraged him from using a third party. (Id.).

On June 28 and once more in late June, Countrywide again told Andre to keep waiting for his paperwork and continued to assure him that there would be no foreclosure sale while his loan modification application was pending, that the July 1 foreclosure sale date should already have been postponed and that his account was being documented appropriately. (Id., ¶ 20, 21). Andre relied on these representations. (Id., ¶¶ 27-28).

On July 1, 2009, ReconTrust sold the Fall Run property to The Bank of New York Mellon for $289,210. 80. (Cushman Decl., Ex. D). By letter dated August 12, 2010, BANA told Andre his loan modification had been declined on June 9, 2009. (Compl., ¶ 23 & Ex. A).

## STANDARD

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule"), a motion to dismiss will be granted where the plaintiff fails to state a claim upon which relief may be granted. A complaint may be dismissed as a matter of law for one of two reasons: "(1) lack of a cognizable legal theory, or (2) insufficient facts under a cognizable legal claim." Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984). The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See* Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974), *overruled on other grounds by* Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012 (1984). In answering this question, the court must assume that the plaintiff's allegations are true and draw all reasonable inferences in favor of the plaintiff. *See* Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).

A complaint need not make "detailed factual allegations," however, "a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S.Ct. 1955 (2007). To survive a motion to dismiss under FRCP 12(b)(6), plaintiffs must allege sufficient facts to "raise a right to relief above the speculative level." Id. at 555. That is, plaintiffs must show that their claims not merely conceivable, but plausible. Id. at 570; Ashcroft v. Iqbal, -- U.S. --, --, 129 S.Ct. 1937, 1950 (2009). This plausibility inquiry is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S.Ct. at 1950. The court inquiry is limited to the face of the complaint, id., and matters that may be judicially noticed, MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986).

//

## DISCUSSION

Based on the facts alleged and recited above, Andre brings claims for negligent misrepresentation, breach of contract, and intentional infliction of emotional distress against both Countrywide and BANA. Defendants move to dismiss Andre's Complaint in its entirety pursuant to Rule 12(b)(6). The determination of defendants' motion is governed by Oregon law. Farina v. Mt. Bachelor, Inc., 66 F.3d 233, 235 (9th Cir. 1995) (substantive law of forum state applies in diversity actions).

## I. Negligent Misrepresentation

Countrywide and BANA argue Andre's negligent misrepresentation claim fails because he cannot establish that he was in a special relationship with either of them. More specifically, defendants argue Andre cannot establish that he gave either of them the responsibility of looking out for his economic interest when negotiating the modification of his mortgage loan.

Under the "economic loss" rule, tort claims for purely economic harm must be predicated on "a statute or a 'special relationship' giving rise to a heightened duty of care, above and beyond the generic duty to avoid unreasonable risk of foreseeable harm." Bell v. Pub. Employees Retirement Bd., 239 Or. App. 239, 243, 247 P.3d 319 (2010), *rev. denied*, 350 Or. 230, 253 P.3d 1079 (2011). Oregon is developing the scope of special relationships giving rise to a heightened duty on a case by case basis. Onita Pac. Corp. v. Trustees of Bronson, 315 Or. 149, 159, 843 P.2d 890 (1992) (en banc) (declining to adopt a black letter rule, although Restatement (Second) of Torts § 552 is "close to the mark"). Special relationships are recognized as existing between various professionals and their clients—including lawyers, physicians, engineers, and architects—as well as in relationships formed by principals, trustees, pledgees, insurers, shippers, and bailors. Conway v. Pac. Univ., 324 Or. 231, 239-40, 924 P.2d

818 (1996) (en banc). Special relationships are thus defined by four traits: "(1) one party relinquishes control over matters, usually financial, and entrusts them to the other party; (2) the party with control is authorized to exercise independent judgment; (3) in order to further the other party's interests; and (4) the relationship either is, or resembles, other relationships 'in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship.'" Bell, 239 Or. App. at 249-50 (*citing* Onita, 315 Or. at 160; Conway, 324 Or. at 240-41).

## A. Defendants Had No Contractual Obligation to Advance Andre's Interests

Andre argues he gave Countrywide and BANA the responsibility of looking out for his economic interests because he entrusted the matter of his mortgage loan modification to them and was required to rely on their exercise of independent professional judgment to achieve that mutually agreed upon purpose of loan modification. Because the loan modification would advance his economic interest in retaining his home, Andre asserts Countrywide and BANA owed him a heightened duty not to negligently misrepresent the status of his modification application. Andre cites Stevens v. First Interstate Bank of Cal., 167 Or. App. 280, 999 P.2d 551 (2000) and Conway v. Pacific University, 324 Or. 231, 924 P.2d 818 (1996) in support of his argument that defendants' acceptance of his modification application imposed an obligation upon them to protect or advance his economic interests.

In Stevens, the Oregon Court of Appeals considered whether the depositor-bank relationship imposed a special duty on the bank to protect the depositor's confidential information from misappropriation by a third party. 167 Or. App. at 285-86. Noting that a depositor-bank relationship "is a highly regulated, arms length commercial relationship, in which the bank's ability to act vis-à-vis its depositors is expressly limited," and that Oregon courts have

consistently found that bank deposits create a debtor-creditor relationship which does not require the bank to exercise independent judgment on the depositor's behalf, the court held that the depositor-bank relationship is governed by the generic common-law foreseeability standard. Id. at 287-88 (internal citations omitted). The court analogized the depositor-bank relationship to a merchant-customer relationship, which requires a customer to provide certain information to a merchant to complete a transaction but does not require the merchant to exercise any independent judgment on the customer's behalf, which the court noted "differs materially" from lender-borrower relationships, which requires the borrower to entrust confidential information to the lender and rely on the lender's exercise of independent professional judgment to achieve an agreed purpose. Id. at 287 (*citing* Conway, 324 Or. at 340).

Andre cites Stevens in support of his argument that the lender-borrower relationship is "special," therefore Countrywide and BANA owed him a heightened duty not to misrepresent the status or progress of his modification application. Andre reads Stevens too broadly. At most, the passing reference to lender-borrower relationships in Stevens may be read to suggest that a lender has a duty to protect a borrower's personal information when processing a loan application. Andre does not argue that defendants breached their duty to safeguard his confidential personal information. Rather, he argues that defendants owed him a heightened duty to avoid making negligent misrepresentations.

Stevens does not establish or suggest that lenders owe borrowers a heightened duty to avoid making negligent misrepresentations as a result of the lender-borrower relationship. Conway does not change this result. The issue in Conway was whether an employer had a special duty to avoid making negligent misrepresentations in the course of negotiating the renewal of an employment contract with a term employee. 324 Or. at 233-35. The Oregon

Supreme Court first noted that the relationships which are deemed "special" under Oregon law all involve an element of trust in that the party owing the duty is also acting in to advance or protect the economic interests of the other party, while the party who is owed the duty has surrendered responsibility and control over the matter to the party owing the duty and therefore is placed in a position of reliance on that party. Id. at 240-41. The court therefore found that although the parties were already in a contractual relationship and therefore not negotiating fully at arm's-length, both the employer and the employee were acting in their own behalf and for their own benefit in the course of the negotiations, therefore the defendant-employer had no responsibility to exercise independent judgment on the plaintiff-employee's behalf or "administer, oversee, or otherwise take care of any of his affairs." Id. at 241-42. The court held that even if the employer's duty to provide its employees with information related to their job security could be construed as giving rise to an obligation by the employer to act in the employee's economic interest, this obligation would not "create the type of relationship that gives rise to a duty to avoid making negligent misrepresentations." Id. at 242.

It may be possible to characterize a loan application or loan modification application as a matter which the borrower surrenders to the control of the lender, and over which the lender will exercise independent judgment in making the ultimate lending decision. However, to the extent that a borrower's interest in obtaining a loan coincides with a lender's interest in making the loan, it is impossible to characterize this as anything but purely incidental. Lending decisions are calculated to maximize profit and minimize loss for the lender, not for the borrower. Thus in making a lending decision, whether that decision pertains to an initial extension of credit or a modification of the terms for an existing debt, the lender may only be understood as acting in its own behalf and pursuing its own economic benefit. As a result, under Conway and Onita, the

lender-borrower relationship lacks the one element common to "special" relationships: the undertaking by the party owing the duty (the lender) to act to advance the economic interests of the party owed the duty (the borrower).

Even if the lender-borrower relationship could be deemed a "special" relationship, this would not be dispositive to the question of whether defendants owed Andre a heightened duty to avoid making negligent misrepresentations. Even in inherently "special" relationships, the fact that a special duty may be owed under certain circumstances does not mean the special duty always applies. For example, in the context of physician-patient relationships, which are generally recognized as being "special," *see* Onita, 315 Or. at 160-61, Oregon courts have declined to hold that the relationship in and of itself imposes a general heightened duty of care that transcends the ordinary foreseeability standard. *See* Rustvold v. Taylor, 171 Or. App. 128, 138-39, 14 P.3d 675 (2000), *rev. dismissed*, 332 Or. 305, 37 P.3d 147 (2001); Curtis v. MRI Imaging Servs. II, 327 Or. 9, 15-16, 956 P.2d 960 (1998). Instead, the court considers the specific harm alleged and examines the standard of care applicable to the particular medical profession to determine whether a heightened duty to safeguard against that harm exists. *See, e.g.*, Rustvold, 171 Or. App. at 138-39 (physician-patient relationship by itself insufficient to support determination that anesthesiologist owed patient a heightened duty to guard against the possibility she would experience emotional distress based on her fear of contracting blood-borne diseases); Paul v. Providence Health Sys., 237 Or. App. 584, 597-600, 240 P.3d 1110 (2010) (physician-patient relationship did not, by itself, impose a special duty on physician to guard against the possibility that the patient would experience emotional distress as the result of the theft of patient's personal medical information).

Here, there is no evidence that the lender-borrower relationship is itself "special," and, even if it was, this would not be sufficient by itself to support the conclusion that defendants owed Andre a heightened duty to avoid making negligent misrepresentations. The fact that Andre may have *relied* on the statements made by Countrywide and BANA does not establish that he had the *right* to rely on those statements. *See* Conway, 324 Or. at 242 n. 5. As defendants point out, Andre was not obligated to wait for Countrywide and BANA to complete their evaluation of his modification application; his ability to seek out and pursue other options was unrestricted. As Andre acknowledges, options other than loan modification through Countrywide and BANA were available to him, including putting his home up for sale and seeking financing through another source. He does not allege that his ability to pursue these alternatives was restricted at any time before or after he submitted his modification application to defendants. Instead, Andre argues that the allegedly negligent misrepresentations made by Countrywide and BANA deprived him of the opportunity to pursue these alternatives. The court finds no basis for holding Countrywide and BANA responsible for Andre's choice not to pursue the alternatives available to him. There is no indication that defendants were under any obligation to modify Andre's loan or, in the event they were unable to do so, to grant him an additional period of time in which to explore his options. Thus, even if the lender-borrower relationship may be deemed to be "special," Andre has failed to establish that by virtue of that relationship Countrywide and BANA owed him a heightened duty to avoid making negligent misrepresentations regarding his loan modification application.

For the reasons stated above, the court finds that the lender-borrower relationship is not a "special" relationship as that term has been defined by Oregon case law. Furthermore, even if

the lender-borrower relationship may be deemed "special," Andre has failed to establish that defendants owed him a heightened duty to avoid making negligent misrepresentations.

### B. Defendants Are Not "Non-Gratuitous Suppliers of Information"

Andre next argues that both Countrywide and BANA hold themselves out to the public as supplying information on home loans and modification of home loans, therefore they are "non-gratuitous suppliers of information" under Onita and consequently owed him a heightened duty to avoid making negligently misrepresenting the facts regarding the status and progress of his loan modification application.

Oregon recognized the existence of the common law tort of negligent misrepresentation for the first time in Onita. 315 Or. at 159. The Oregon Supreme Court limited the tort to certain "special relationships," in which one party owed a duty "beyond the common law duty to exercise reasonable care to prevent foreseeable harm" to the other party. Id. To determine when such a relationship existed, the court examined the nature of the parties' relationship in comparison to relationships in which the law recognized a heightened duty of care. Id. at 160. The court noted that where such a duty is imposed, the party owing the duty was typically hired or retained for the purpose of using their services and expertise in behalf of and acted, at least in part, to further the economic interests of, a client, employer, or intended third party beneficiary. Id. at 160-61. The court distinguished these relationships from those like the one before it, which involved adversarial parties engaged in arm's-length negotiations. Id. at 161. The court therefore limited the tort of negligent misrepresentation to relationships involving "nongratuitous suppliers of information [who] owe a duty to their clients or employers or to intended third-party beneficiaries of their contractual, professional, or employment relationship to exercise reasonable care to avoid misrepresenting facts." Id. at 165. The Oregon Supreme Court has subsequently

held that the term "nongratuitous supplier of information" denotes a relationship in which a party is "in the business of supplying information for a fee." Conway, 324 Or. at 243 (university's contractual obligation to provide employees with certain information not provided to the general public did not qualify university as "nongratuitous supplier of information").

Andre asserts that Countryside and BANA are "nongratuitous suppliers of information" because they hold themselves out to the public as supplying information on home loans and modification of home loans. The court disagrees with this characterization. Countrywide and BANA are, for the purposes of the case at bar, in the business of selling home loans. The fact that they offer information about their products in the course of selling them does not change the nature of their business from selling loans to supplying information about loans; it simply reflects the reality that lenders advertise the products they sell.

As described above, a lender's purpose in making or modifying a loan is to advance its own economic interests, not to advance or protect the financial interests of the borrowers who apply for financing. Borrowers do not hire a lender to provide financing; rather, they negotiate with lenders to obtain financing. Moreover, the interests of the lender and the borrower are adversarial in these negotiations on critical terms such as fees, interest rates, and loan amount. The lender's goal is to extend a loan on terms that generate a return that outweighs the lender's risk of loss in the event of default. By contrast, the borrower's goal is to obtain a loan on terms which minimizes the cost to the borrower. A borrower is therefore distinguishable from a client or employer who hires an attorney, engineer, or architect for their expertise to provide professional services. Furthermore, in the lender-borrower relationship each party acts to advance and protect its own economic interest, therefore it is unlike an insurer-insured or agent-

principal relationship. Therefore, the court concludes that lenders are not "nongratuitous suppliers of information" under Onita.

## Conclusion

In sum, the court finds that the lender-borrower relationship is not a "special" relationship as that term has been defined by Oregon case law, and that, even if it is, Andre has not established any facts that show this relationship imposes a heightened duty on Countrywide or BANA to avoid making negligent misrepresentations. The court further finds that neither Countrywide nor BANA is a "non-gratuitous supplier of information under Onita. Defendants' motion to dismiss Andre's negligent misrepresentation claim should therefore be granted.

## II.  Breach of Contract

It is undisputed that the deed of trust securing Andre's loan constitutes a binding contract between the parties. By its express terms, the deed of trust provides that acts of forbearance do not waive the lender's right to exercise its rights and remedies under the contract in the event of default, including pursuing foreclosure. However, Andre argues the parties orally agreed to modify the terms of their agreement and that, under the terms of the modification, defendants agreed not to foreclose while considering his modification application. Andre argues defendants breached this agreement by completing the foreclosure sale while his loan was in a "modification" status. Countrywide and BANA argue Andre's breach of contract claim is barred by the statute of frauds, or, in the alternative, is barred for lack of consideration and clear and convincing evidence of an agreement to modify the existing contract.

### A.  The Statute of Frauds Does Not Apply

Oregon's statute of frauds provides that certain types of agreements, including those "to forbear with respect to the terms of the repayment of any debt payable in money, [or] to modify

or amend the terms under which the person has lent money or otherwise extended credit" must be in writing to be enforceable, unless an exception applies. OR. REV. STAT. § 41.580(1)(h); Sawyer v. ReconTrust Co., N.A., No. CV-11-292-ST, 2011 WL 2619517, at * 6 (D. Or. May 27, 2011). The statute of frauds provides an exception for oral forbearance and modification agreements where the loan at issue is secured by the debtor's primary residence and at least one party to the alleged agreement is a financial institution. OR. REV. STAT. § 41.580(1)(h)(A) & (B); Sawyer, 2011 WL 2619517, at * 6 n. 5.

As defendants point out, the agreement they are alleged to have breached is not an agreement to modify Andre's mortgage loan; it is an agreement to forbear foreclosing on Andre's loan while his modification application was under review. Both Countrywide and BANA are financial institutions, and it is evident both from the terms of the deed of trust and the allegations in the Complaint that the Fall Run property was Andre's primary residence. (*See* Compl., ¶¶ 3, 24, 27, 30 (repeatedly identifying the Fall Run property as Andre's "home" and "residence"); Cushman Decl., Ex. A, ¶ 6 (requiring that Andre "occupy, establish and use the [Fall Run] Property as [his] principal residence")). The alleged agreement thus falls within the exception created by ORS § 41.580(1)(h)(A) & (B): it is an oral forbearance agreement regarding a loan secured by the debtor's primary residence, and at least one party to the agreement is a financial institution. The statute of frauds therefore does not apply.

## B. The Alleged Modification Fails for Lack of Consideration and Clear and Convincing Evidence of Mutual Consent

Defendants argue Andre's breach of contract claim fails because there is no writing to evidence the alleged oral contract. In the alternative, defendants argue the claim fails because Andre cannot establish by clear and convincing evidence that there was an agreement to modify the terms of the deed of trust or that such a modification was supported by consideration.

### 1. Lack of a writing does not preclude plaintiff's breach of contract claim

Under Oregon law, parties may modify a written contract orally even if the writing contains an express provision against non-written modifications. Bennett v. Farmers Ins. Co., 332 Or. 138, 147 n. 7, 149, 26 P.3d 785 (2001); Anderson v. Divito, 138 Or. App. 272, 282, 908 P.2d 315 (1995) (internal citation omitted); Barinaga v. JP Morgan Chase & Co., 749 F. Supp. 2d 1164, 1173 (D. Or. 2010). Therefore, even if the deed of trust expressly requires that any modification of its terms be evidenced by a writing, the absence of a writing evidencing the parties' agreement to modify the terms of the deed of trust does not bar Andre's breach of contract claim.

### 2. Alleged modification fails for lack of consideration and clear and convincing evidence of mutual consent to modify

Parties to a contract may orally modify their written agreement by mutual consent. Divito, 138 Or. App. at 281 (citing Mail–Well Envelope Co. v. Saley, 262 Or. 143, 151–52, 497 P.2d 364 (1972)). However, to be binding, the oral modification of a written contract must be supported by consideration and proven by clear and convincing evidence. Miller v. Coldwell Banker W. Real Estate, 172 Or. App. 494, 500, 19 P.3d 948 (2001) (citing Divito, 138 Or. App. at 281-82).

Andre argues his agreement to default and thereby incur late fees and other charges is sufficient consideration to support the parties' alleged oral modification agreement. (Compl., ¶ 33-38). Andre has not offered, and this court has not found, any authority that supports the proposition that a party's breach of his contractual obligations may serve as valuable consideration for the modification of that contract's terms. Inasmuch as Andre argues Countrywide and BANA benefitted from his breach by assessing penalties and late charges on his loan, this argument fails because defendants were already entitled to these penalties and

charges under the terms of the Note and deed of trust securing Andre's loan. (*See* Cushman Decl., Ex. A, ¶ 1). Thus, even if Countrywide and BANA promised not to foreclose on Andre's loan in return for his promise not to make his monthly loan payments, which they deny, they received nothing in return for their promise except a benefit to which they were already legally entitled. Andre's breach of his contractual obligation to make monthly loan payments therefore is not consideration that may support the alleged oral modification. *See* Barinaga, 749 F. Supp. 2d at 1173-74 ("if a person gets nothing in return for his promise but that to which he is already legally entitled, the consideration is unreal") (*citing* Hoskins v. Powder Land Irrigation Co., 90 Or. 217, 222-23, 176 P. 124 (1918) and Collins v. Post, 227 Or. 299, 304, 362 P.2d 325 (1961)).

Furthermore, Andre has not shown by clear and convincing evidence that the parties mutually consented to modify the deed of trust. In the context of disputed oral agreements, the determination whether the parties mutually consented to an exchange is governed by the parties' objective manifestations of assent in the course of negotiations or past conduct. Kabil Developments Corp. v. Mignot, 279 Or. 151, 158, 566 P.2d 505 (1977) (mutual consent "must be constructed from [the parties'] communications and overt acts, not their undisclosed intents and ideas"). Here, Andre argues the parties mutually agreed that defendants would not foreclose his loan while his modification application was under consideration, and that defendants breached this agreement by foreclosing his loan while it was in a "modification" status. Thus, Andre appears to argue that the parties mutually agreed to modify paragraph 12 of the deed of trust, which provides "[a]ny Forbearance by [defendants] in exercising any right or remedy . . . shall not be a waiver of or preclude the exercise of any right or remedy."

In support of his argument, Andre offers defendants' statement that he would have to miss loan payments in order to be eligible for consideration for a loan modification, the fact that

he subsequently failed to make payments on his loan and thereafter applied for a modification, and the repeated statements by defendants' agents that his loan would not be foreclosed on while his modification application was under review. Even accepting these allegations as true, Andre has failed to establish that he bargained for and defendants agreed to forbear foreclosing on his loan. At most, these facts demonstrate that *after* Andre applied for a loan modification, defendants gratuitously promised to forbear foreclosing his loan while they processed his application. Moreover, the facts alleged demonstrate that defendants lived up to that representation: defendants postponed the foreclosure sale twice while Andre's modification application was under review, declined Andre's modification application on June 9, 2009, and foreclosed on the property on July 1, 2009.

Andre argues defendants did not tell him they were going to foreclose and in fact led him to believe that his modification application was still under review after it had been declined. Nothing about these facts supports the conclusion that the parties negotiated and agreed that defendants' temporary forbearance from foreclosing waived or otherwise precluded defendants from exercising their right to foreclose without first giving Andre notice that his modification application had been declined and allowing him some period of time in which to pursue other financing options. As discussed above, Andre was aware other options were available to him and was free to explore these options while defendants reviewed his modification application, but chose not to do so despite his knowledge that a foreclosure sale was pending. The deed of trust expressly provides that any act of forbearance by defendants would not waive or preclude their right to pursue any right or remedy secured to them by the contract, including foreclosure. Andre has failed to allege any facts demonstrating that the parties negotiated and mutually agreed to modify this term of their contract.

Page 18 – REPORT AND RECOMMENDATION

For the reasons stated above, the court finds that Andre has failed to establish that the parties mutually consented to modify their written agreement or that the alleged oral modification is supported by valid consideration. Defendants' motion to dismiss Andre's claim for breach of contract should therefore be granted.

## III. Intentional Infliction of Emotional Distress

Countrywide and BANA argue Andre's intentional infliction of emotional distress ("IIED") claim fails because Andre cannot establish that (1) the parties were in a "special relationship"; (2) defendants engaged in any "outrageous" conduct; and (3) defendants intended to cause him emotional distress.

To state a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must prove three elements: "(1) that defendants intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress; (2) that defendants engaged in outrageous conduct, i.e., conduct extraordinarily beyond the bounds of socially tolerable behavior; and (3) that defendants' conduct in fact caused plaintiff severe emotional distress." House v. Hicks, 218 Or. App. 248, 357-58, 179 P.3d 730 (2008) (*citing* McGanty v. Staudenraus, 321 Or. 532, 543, 550, 901 P.2d 841 (1995)). IIED claims typically turn on whether the defendant's conduct is sufficiently outrageous. Id. at 358.

Whether the alleged conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law for the court. Harris v. Pameco Corp., 170 Or.App. 164, 171, 12 P.3d 524 (2000). The conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" House, 218 Or. App. at 358–60 (*quoting* Restatement (Second) of Torts, § 46, comment d). Several contextual factors to help

guide this analysis, the most important of which is whether the parties are in a special relationship which imposes a heightened duty on the defendant to avoid subjecting the plaintiff to "abuse, fright, or shock than would be true in arm's-length encounters among strangers." McGanty, 321 Or. at 547-48. Courts also consider whether the complained-of conduct was illegal or criminal, the setting in which the conduct occurred, whether the conduct was undertaken with an "ulterior motive," and whether the conduct was intended to "take advantage of an unusually vulnerable individual." Id. at 359, 360 (citations omitted).

Here, the court has already determined that Andre and defendants were not in a special relationship, but rather were in an arm's-length contractual relationship. Defendants therefore were not under any heightened duty to avoid causing Andre to experience distress. As to the complained-of conduct itself, Andre alleges defendants acted outrageously by purposefully inducing him to default on his loan, stringing him along with promises that his loan was in modification status and resetting the foreclosure sale date twice, and then failing to inform him his modification application had been denied before foreclosing on his property, thereby depriving him of the opportunity to obtain financing from another source to bring his loan current and costing him all of his equity in his home. Even accepting these allegations as true, these actions were not illegal or criminal, there is no evidence to support the conclusion that the actions were undertaken with an ulterior motive, and nothing indicates that defendants knew Andre was an unusually vulnerable individual and acted to take advantage of him. Instead, the alleged conduct all occurred in the course of defendants' servicing Andre's loan, processing his modification application, and foreclosing on his loan. Defendants' actions in foreclosing on Andre's loan is a remedy explicitly contemplated by the contract between the parties, and Andre

expressly consented that any forbearance by defendants in exercising their right to foreclose
would waive or preclude defendants from exercising their right to so.

In light of all the circumstances, defendants' actions were at all material times within the
bounds of socially tolerable conduct. Defendants' motion to dismiss Andre's IIED claim should
therefore be granted. The court does not perceive any manner in which the claim could be
amended so as to cure its deficiencies.

## IV. Leave to Amend

Andre requests leave to file an amended complaint to cure any deficiencies in his
Complaint should the court grant defendants' motion to dismiss. Defendants argue that granting
leave to amend would be futile and therefore seek dismissal with prejudice.

Defendants have not yet filed an Answer or other responsive pleading to the Complaint;
they responded to Andre's Complaint by removing filing a motion to dismiss. A motion to
dismiss under Rule 12(b)(6) is not a responsive pleading. Miles v. Dep't of Army, 881 F.2d 777,
781 (9th Cir. 1989). Therefore, defendants have not yet served a responsive pleading.
Additionally, Andre has not yet amended his Complaint. The operative language of Rule 15(a)
for such situations gives Andre the right to "amend [his] pleading once as a matter of course."
FED. R. CIV. P. 15(a)(1). Dismissal without leave to amend is therefore improper. *See* Seattle
Fishing Servs. LLC v. Bergen Indus. & Fishing Co., 242 Fed. Appx. 436, 438 (9th Cir. 2007)
(dismissal of complaint without leave to amend proper where plaintiff no longer had a right to
amend as a matter of course and never requested leave to amend); Williams v. Bd. of Regents of
Univ. Sys. of Georgia, 477 F.3d 1282, 1292 at n. 6 (11th Cir.2007) (court lacks discretion to
reject amended complaint on grounds of futility where plaintiff has the right under Rule 15(a) to
file an amended complaint as a matter of course).

For the reasons stated above, Andre's request for leave to file a first amended complaint should be granted.

## RECOMMENDATION

For the reasons stated above, the motion to dismiss (#6) filed by Countrywide and BANA should be GRANTED and Andre's request for leave to file an amended complaint should be GRANTED.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by January 3, 2012. If objections are filed, any response to the objections is due by January 20, 2012. See* FED. R. CIV. P. 72, 6.

DATED this _____ day of December, 2011.

MARK D. CLARKE
United States Magistrate Judge